USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: JUN 17 2014

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------------------X
                            :

IN RE PUDA COAL SECURITIES INC.,    :        11-cv-2598 (KBF)
et al. LITIGATION                    :   and all member and related
                            :         cases
                            :

                            :     OPINION & ORDER

This document relates to: ALL ACTIONS  :
                            :
-----------------------------------------------------------------X

KATHERINE B. FORREST, District Judge:

      An accounting firm's worst nightmare might be to wake up one morning and discover that the company that one of its teams had audited for the past several years had in fact disappeared, and that what the team had been auditing had been merely a mirage. A twist that could serve only to heighten this distress might be the discovery that the company had been stolen a few years prior—its operations and related revenues transferred away—but that the engagement team had not discovered this fact. The team had issued a "clean opinion." The accounting error in such a case would be fundamental: all aspects of the financial position of the company would have been entirely misstated, because the operations on which it was based were long gone. This scenario is not the storyline for an auditor's version of a horror film; it is what happened here.

      Until April 2011, Puda Coal Inc.'s ("Puda") shareholders believed there was value in the securities they held—that Puda continued to own 90% of Shanxi Puda Coal Group Co., Ltd. ("Shanxi Coal"), a supplier of premium high-grade metallurgical coking coal used in steel manufacturing. However, in September

2009, Puda's chairman, Ming Zhao ("M. Zhao"), and his brother, Yao Zhao ("Y. Zhao"), had arranged to transfer Puda's entire interest in Shanxi Coal to M. Zhao personally. This transfer left Puda as a shell company, lacking any operations or other source of revenue. The transfer was reflected in minutes of a shareholder meeting for Shanxi Coal and in documents filed in the Shanxi office of China's State Administration of Industry and Commerce ("SAIC").

Moore Stephens Hong Kong ("MSHK") audited Puda throughout the class period, and Moore Stephens, P.C. ("MSPC") performed an "Appendix K" review. (The Court refers to MSHK and MSPC together as "the Auditors.") Puda made periodic filings with the Securities and Exchange Commission ("SEC"), which incorporated audit opinions on its financial statements. Puda also discussed its financial statements in press releases.

In April 2011, the game was up. On April 8, 2011, a research report published by Alfred Little (the "Little Report") disclosed the Zhao brothers' transfer of Shanxi Coal. Puda's shares declined 34%; one trading day later, the SEC halted trading of Puda's shares entirely. The first of many lawsuits was filed on April 15, 2011. (ECF No. 1.) A number of lawsuits were filed thereafter and consolidated. Following motion practice and discovery, a Second Consolidated and Supplemental Amended Complaint ("SCAC") was filed on April 21, 2014. (ECF No. 352.)

The SCAC alleges violations of the securities laws against a variety of individuals and entities, including Puda's Auditors.[1] Plaintiffs bring claims against

---

[1] Claims remain pending against several defendants. On May 20 and 21, 2014, Brean Murray, Carret & Co. and Macquarie Capital (USA) Inc. filed motions to dismiss the SCAC. (ECF Nos. 370,

the Auditors pursuant to Section 11 of the Securities Act of 1933 (Count I) and Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder (Count IV).

Pending before the Court are eight intertwined motions.

On February 14, 2014, the Auditor defendants both moved for summary judgment as to all claims against them on the basis that plaintiffs have failed to raise triable issues as to the subjective falsity of the alleged misstatements as well as to scienter, and, in the case of MSPC, on the basis that it was not the "maker" of any of the alleged misstatements.  On February 14, 2014, MSHK also moved to exclude plaintiffs' sole proposed auditing expert, Anita C.M. Hou, on the basis that she lacks the expertise to opine on any issues of relevance and that the opinions she does offer are irrelevant to any issue in the case.  MSPC joined that motion.  (ECF Nos. 297, 298.)  Those motions became fully briefed on May 7, 2014.

In addition to her expert report, Hou also submitted two declarations in opposition to the Auditors' motions for summary judgment on March 28, 2014.  On May 7, 2014, MSHK moved to strike these declarations, and MSPC joined that motion.  (ECF No. 364.)  That motion became fully briefed on June 6, 2014.

On March 28, 2014, plaintiffs moved to exclude the Auditors' three proposed experts: Alexander H. Mackintosh and Peter S. Nurczynski on the basis that their reports are procedurally inappropriate case-in-chief reports masquerading as

---

373.)  On June 2, 2014, defendants C. Mark Tang and Lawrence S. Wizel (the former U.S.-based independent directors of Puda), MSHK, and MSPC answered the SCAC. (ECF Nos. 377–379.)  A somewhat complicated procedural history resulted in the Auditors and plaintiffs having completed discovery prior to the remaining defendants.

3

"rebuttal" reports, and Wang Weimin, on the basis that he lacks necessary expertise and his opinions are merely ipse dixit. Those motions became fully briefed on May 28, 2014.

Finally, plaintiffs have moved to strike MSHK's reply in support of its Local Civil Rule 56.1 statement of material facts. Defendants opposed this motion on June 6, 2014.

For the reasons set forth below, the Auditors' motions for summary judgment and to exclude Hou and strike her declarations are GRANTED. While essentially rendered moot, plaintiffs' motions regarding Nurczynski, Mackintosh and Weimin are DENIED. Plaintiffs' motion to strike MSHK's reply is also DENIED.

I.    FACTS

The following facts are undisputed unless otherwise noted.

Puda was incorporated in 2001. (Def. MSHK's Resp. to Pls.' Separate Stmt. of Add'l Material Facts ("MSHK 56.1 Resp.") ¶ 1.) In 2005, through a reverse merger, Puda acquired a 100% interest in Puda Investment Holding Limited ("BVI"), which in turn owned 100% of Shanxi Putai Resources Ltd. ("Putai"). (Id. ¶ 2.) Puda conducted its operations exclusively through Shanxi Coal, a PRC limited-liability company. (Id. ¶ 3.) In November 2007, Putai became a 90% owner of Shanxi Coal, with the remaining 10% held by M. Zhao and Y. Zhao. (Id. ¶ 5; [Corrected] Pls.' Resp. to Def. MSHK's Stmt. of Material Facts ("Pls.' 56.1 Resp.") ¶ 10.) As of December 31, 2009, M. Zhao and Y. Zhao owned 60% of Puda and the 10% of Shanxi not owned by Putai. (MSHK 56.1 Resp. ¶ 6.) M. Zhao was the chairman of the boards of Puda and Shanxi Coal in 2009 and 2010; he was also

4

identified as a legal representative on Shanxi Coal's 2009 business license. (Id. ¶ 7.) Y. Zhao was identified as the legal representative of Shanxi Putai Minerals Co. (also "Putai") on its 2011 business license. (Id. ¶ 8.) PRC regulations designated the Zhao brothers, as the registered legal representatives of Shanxi Coal and Putai, as the "responsible person who acts on behalf of the [entity], in exercising its functions and powers . . . in accordance with the law or the articles of association." (Id. ¶ 9.) The Zhao brothers' roles as "legal representatives" were necessary to make the subsequent fraudulent transfers. (Id.) In December 2009, Puda's board of directors approved a change in Puda's business strategy, expanding its focus from solely a coal-washing business to include mining. (Pls.' 56.1 Resp. ¶ 11.)

According to the findings of Puda's Audit Committee released in September 2011, in September 2009, M. Zhao "arranged for Shanxi Putai Resources Limited ('Putai'), another subsidiary of [Puda] and the parent company of Shanxi Coal, to transfer its 90% ownership (and thereby [Puda's] indirect 90% ownership) of Shanxi Coal to himself." (Id. ¶¶ 15, 16.) The Audit Committee also found that Y. Zhao, M. Zhao's brother, who was the legal representative of Putai, had "authorized the transfer." (Id. ¶ 16.) Y. Zhao also transferred a personal 2% ownership interest that he had in Shanxi Coal to his brother, resulting in M. Zhao having a 99% ownership interest. (Id. ¶¶ 16, 17.) The Audit Committee also found that "Liping Zhu, the

5

Company's CEO, President and director on the Board, was aware of the 90% Transfer but did not disclose it to any other director." (Id. ¶ 18.)

In July 2010, now owning 99% of Shanxi Coal, M. Zhao "signed various documents to further transfer 49% of the ownership of Shanxi Coal to CITIC," a state-owned private equity fund in the People's Republic of China ("PRC"). (Id. ¶¶ 17, 19.) Also in July 2010, M. Zhao and Wei Zhang (a Shanxi Coal employee who owned the remaining 1% of Shanxi Coal), together pledged—but did not transfer—their remaining 51% ownership of Shanxi Coal to CITIC. (Id. ¶ 20.)

The transfer of Putai's interest in Shanxi Coal to M. Zhao, M. Zhao's subsequent transfer of 49% of his interest to CITIC, and the 51% pledge by M. Zhao and Wei to CITIC were not disclosed in Puda's 2009 or 2010 financial statements at the time that they were filed with the SEC; those statements indicated that Puda still maintained an indirect 90% interest of Shanxi. (Id. ¶ 22.) Because Puda had no indirect or direct interest in the operations or revenues of Shanxi Coal as of September 2009, but disclosed in its financial statements that it did, its financial statements for those periods were materially misstated and not prepared in accordance with Generally Accepted Accounting Principles ("U.S. GAAP"). (Id. ¶ 23.)

On April 8, 2011, Alfred Little published a short seller report disclosing the Zhao transfers of Shanxi Coal away from Putai and Puda. (Id. ¶ 15.) On July 7, 2011, the Auditors resigned. (Id. ¶ 29.)

Puda's financial statements contained in its Form 10-Ks for the years 2009 and 2010 included all of the assets, liabilities, revenues, expenses, and net income for Shanxi Coal. (MSHK 56.1 Resp. ¶ 14.) Puda's 2009 annual report disclosed that Shanxi Coal had over $200 million in revenue for the year. (Id. ¶ 13.).

The SAIC administers the registration of enterprises, entities, and individuals engaged in business operations in China. (Id. ¶ 15.) The SAIC issues business licenses for PRC companies. (Id. ¶ 17.) A business license includes information relating to, inter alia, the name and address of the company and its legal representative, the type and scope of its business, and the amount of registered or paid-in capital. (Id. ¶ 17.) A business license typically does not show the identity or ownership interest of particular shareholders. (Id. ¶ 18.) Chinese law requires that such information be contained in the company's "articles of association." (Id. ¶ 19.) Chinese law also requires that a company's transfer of equity must amend the names of shareholders and their capital contributions in its articles of association. (Id.) As of 1983, SAIC required that all companies operating with a PRC business license undergo annual inspections. (Id. ¶ 16.)

When a company first registers with the SAIC, the company files a form with the SAIC disclosing the names of its shareholders, the amounts of their contribution, and the total registered capital. (Id. ¶ 22.) If the company's shares are transferred or the amount of registered shares is altered, the company must

7

notify the SAIC and apply for approval of the changes.  (Id.)  The SAIC issues the company a new business license if and when such changes are approved.  (Id.)

When shareholders makes a capital contribution, a PRC-certified public accountant must issue a "capital verification report" ("CVR"); when a company registers or changes its capital, it must file a CVR with the SAIC.  (Id. ¶ 21.) However, if only the identity or percentage of ownership of shareholders changes, and the total amount of contributed capital remains unchanged, then the company is not required to file the CVR with the SAIC.  (Id.)  A CVR is typically valid for 90 days from the date of issue.  (Id.)

### A.   Audit Standards

MSHK conducted its audit of Puda pursuant to Public Company Accounting Oversight Board ("PCAOB") audit standards.  (Id. ¶ 24.)  MSHK used a Thompson Reuters Practitioner's Publishing Company Guide to PCAOB Audits ("PPC Guide"), as the basis for preparing its work papers and conducting audits of Puda.  (Pls.' 56.1 Resp. ¶ 60.)  As a non-U.S. firm, Moore Stephens is required to have "Appendix K" review procedures performed on its audits of U.S.-registered companies; senior auditors from MSPC based in the U.S. performed that function.  (See id. ¶ 73; Decl. of Brian J. Massengill ("Massengill Decl.") Ex. 2 (Expert Report of Alexander H. Mackintosh ("Mackintosh Rep.")), at 4, 11, 12.)  PCAOB audit standards require that MSHK obtain "reasonable assurance," defined as a "high level" of assurance, to support its audit conclusions.  (MSHK 56.1 Resp. ¶¶ 30, 31.)

MSHK's 2009 and 2010 audits of Puda's financial statements were combined with audits of its internal controls.  (Id. ¶ 24.)  The MSHK partners and principals

on the MSHK engagement team for both the 2009 and 2010 year-end audits had experience auditing both PRC and US-listed companies, and assessing and testing internal controls. (Pls.' 56.1 Resp. ¶ 51.) They also had experience issuing audit reports in accordance with PCAOB standards. (Id.) The partners and principals on the audits were each multilingual in Cantonese, Mandarin, and English. (Id. ¶ 52.) The MSHK audit engagement team for Puda also had access to and used U.S. technical resources in conducting its audit work, specifically with regard to U.S. GAAP and PCAOB standards. (Id. ¶ 61.)

MSPC conducted an Appendix K review relating to Puda and issued MSHK a clearance letter stating that based on its review of, inter alia, the financial statements and MSHK's work papers, the financial statements were prepared in accordance with GAAP and the PCAOB standards. (Id.) MSPC did not provide an audit opinion to Puda directly, nor was any audit opinion included directly in any of Puda's financial statements; MSPC was not a signatory on the audit opinion letter provided by MSHK to Puda and incorporated into its Form 10-K.

MSHK personnel spent substantial time at Shanxi Coal in connection with their work. (Id. ¶ 63.) In connection with the 2009 and 2010 year-end audits, four or five MSHK auditors each spent approximately a month each year at Shanxi Coal's facilities and corporate headquarters in Shanxi Province conducting fieldwork. (Id. ¶ 65.) As part of their work, the team inspected physical assets and took photographs as audit evidence. (Id.) Puda's controller, Irene Cheong, interacted regularly with the MSHK audit team. (Id. ¶¶ 66, 67.) The chairman of

Puda's Audit Committee testified that he was "very impressed" with the quality of MSHK's work. (Id. ¶ 69.)

    B.    The 2009 Audit

At the outset of its 2009 audit of Puda, MSHK completed a "Fraud Risk Identification Form." (MSHK 56.1 Resp. ¶ 27.) In its "Information Gathered" section, the form states that "management is dominated by [a] single individual," and that there is a "Potential Fraud Risk" of "Management override of controls." (Id.) The form also sets forth the procedures that MSHK must perform in order to address the risk of "management override of controls" on a page designated as "PCA-AP-2." (Id.) These procedures include "examin[ing] journal entries and other adjustments for evidence of possible material misstatement due to fraud," "review[ing] accounting estimates for bias that could result in material misstatements due to fraud," and "evaluat[ing] the business rationale for significant unusual transactions." (Id.)

In its 2009 audit, MSHK performed the following procedures to confirm that Putai owned 90% of Shanxi Coal:

        a.   Reviewed a management representation letter from Puda;

        b.   Reviewed an unsigned "form" of a legal opinion from PRC counsel in connection with a February 2010 public offering;

        c.   Reviewed minutes of Puda's Audit Committee and board of directors;

        d.   Made an inquiry to Puda's chief financial officer ("CFO"), Laby Wu;

        e.   Reviewed Puda's SEC filings; and

        f.   Reviewed a share registry maintained by Shanxi Coal.

(Id. ¶ 29.)

MSHK's working papers for 2009 contained a "Section V" relating to auditing "Capital, Reserves and Dividends" for Shanxi Coal. (Id. ¶ 32.) Section V contained an "Audit Program for Capital Stock and Other Equity Accounts." (Id. ¶ 33.) The first item in this audit program required MSHK to review Puda's board minutes and note any equity transactions that had been authorized. (Id.) In its work papers, MSHK noted, "No meeting between directors was held in the current year. No equity transaction was noted in the current year." (Id.) The second audit procedure in Section V concerned transactions in equity accounts and required MSHK to "[c]ompare the balances with those of the prior years or other expectations, considering known changes in client operations and equity financing activity." (Id. ¶ 34.) In its work papers, MSHK noted that it performed the comparison and that "no change was noted." (Id.) The third audit procedure required in Section V was that MSHK "[t]est significant transactions affecting paid-in capital, contributed capital, or treasury stock." (Id. ¶ 35.) Work papers V10, V12, and V13 reflect steps that MSHK performed in this regard. (Id. ¶ 36.) V10 contains a breakdown of the registered capital of Shanxi Coal and the names of corresponding shareholders. (Id. ¶ 37.) MSHK noted on this work paper that "no movement was noted in the current year." (Id. ¶ 38.)

Work paper V20/1 is an unsigned September 25, 2008 Shanxi Coal shareholder meeting resolution that states, "This unsigned minute is attached as it is [sic] only served as reference purpose since the minute was issued in year 2008

11

and audited in prior year's audit." (Id. ¶ 42.) The unsigned shareholder resolution also referred to a shareholder dividend to be paid. (Id.) As of March 31, 2009, this dividend had not been paid. (Id. ¶ 44.) Puda's 2009 and 2010 Form 10-Ks disclosed that the dividend had not been paid and that "the Zhao brothers may declare dividend out of Shanxi Coal." (Id. ¶ 44, 45.)

Section Z of MSHK's working papers focused on the consolidation of subsidiaries. (Id. ¶ 46.) Item 4 of the Section Z audit program states that MSHK should "[c]onfirm that all group undertakings have been identified for inclusion in the consolidation with the extent and form of the group's interest in each undertaking noted. Ensure that all undertakings are noted on the group structure Z/8." (Id. ¶ 47.) Ida Law, a member of MSHK's engagement team who led the audit for year-end 2010, testified that this "Item 4" step was intended to confirm that Puda owned 90% of Shanxi Coal. (Id. ¶ 48; see also Pls.' 56.1 Resp. ¶ 56.) When asked during a deposition question what steps MSHK took to check whether Shanxi Coal was still a subsidiary, Law testified, "We . . . already inquired management if there—there are any changes in—in the group structure. And they—their answer is—was no change." (MSHK 56.1 Resp. ¶ 50.)

As part of its audit procedures, MSHK obtained a copy of Shanxi Coal's business license. (Id. ¶ 51.) MSHK intended to obtain a copy of the 2009 business license, but Puda's CFO, Laby Wu, instead emailed a copy of a business license that had been issued in September 2007. (Id. ¶ 52.) That license contained an inspection stamp from the SAIC dated March 27, 2009. (Id.) On its face, the

12

business license states, "The enterprise must participate in the annual inspection between March 1 and June 30 of each year." (Id.)  Laby Wu sent MSHK the license on February 10, 2010, prior to the time that the SAIC would have received its next annual inspection. (Id.)  No other business license for Shanxi Coal is in the record on this motion.

Goodwin Procter LLP, counsel for certain Puda directors whom plaintiffs have sued in this consolidated lawsuit, produced a Shanxi Coal business license issued on September 9, 2009, showing that the registered capital had increased from 22.5 million RMB to 100 million RMB. (Id. ¶ 53.)[2]

As part of its 2009 audit, MSHK obtained an unsigned draft "form" of a legal opinion from Puda's PRC counsel that, according to Mackintosh, corroborated that there had been no change in the company's capital structure in 2009. (Id. ¶ 57.)

Section W of MSHK's work papers contains an audit procedure to identify related party transactions. (Id. ¶ 58.)  To perform this step, MSHK was required to review minutes from Shanxi Coal's board and shareholder meetings. (Id. ¶¶ 58, 59.)  MSHK requested but did not receive such minutes and was told that no such minutes existed. (Id. ¶ 60.)  Cheong, Puda's controller, testified that MSHK requested minutes of Shanxi Coal's board and shareholder meetings each quarter. (Id. ¶ 64.)  MSHK's audit program contains additional steps to identify related party

---

[2] MSHK argues that this Court should disregard this document because plaintiffs have taken no testimony to authenticate it. (Id. ¶ 54.)  However, on summary judgment this Court may consider documents that would be admissible at trial. See, e.g., Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  This business record is the type of document that this Court assumes a corporate witness would authenticate prior to or at trial.

13

transactions including "[r]eview documents in the permanent file, income tax returns, SEC filings (including proxy materials and Forms 8-K), other regulatory filings, and current year minutes for possible related parties and related-party transactions." (Id. ¶ 74.)

MSHK did not obtain Shanxi Coal's filings from the SAIC for in connection with its 2009 audit. (Id. ¶¶ 75, 81.) Law testified that it is possible to hire an agent to obtain filings from the SAIC and that she had performed "company search[es]" on occasion in circumstances that warranted such searches. (Id. ¶ 76.) Law testified that she did not believe that the 2009 audit of Puda presented circumstances requiring such a step. (Id. ¶ 77.)

The corporate rules governing Shanxi Coal's operations, its Memorandum and Articles ("M&A"), provide that Shanxi Coal should hold shareholder meetings every quarter. (Id. ¶¶ 65, 66.) MSHK was aware that Shanxi Coal entered into several significant shareholder transactions during 2009. (Id. ¶ 67.) MSHK's 2009 Audit Planning Memorandum noted that one of the transactions into which it had entered (an acquisition of 18% of Shanxi Jianhe Coal Limited), as well as Shanxi Coal's appointment as a "coal mine consolidator," presented significant accounting and auditing issues. (Id. ¶¶ 67, 70.) As part of its 2009 audit, MSHK reviewed the Jianhe Coal transaction, including obtaining its SAIC filing. (Id. ¶ 72.)

Shanxi Coal's September 3, 2009 "Resolution and regulation amendment of the first shareholders' meeting" authorizes the transfer of Putai's 90% ownership in Shanxi Coal to M. Zhao and his brother Y. Zhao. (Id. ¶ 73; Decl. of Laurence Rosen

("Rosen Decl.") Ex. 28, at SH_PUDA002968.)  Shearman & Sterling LLP produced

that document as part of the document production in this case.  (MSHK 56.1 Resp. ¶

73.)[3]

MSHK issued a clean audit opinion with respect to Puda's 2009 Audit.  (Id. ¶

83.)  Its audit opinion, included in Puda's Form 10-K, stated, "We conducted our

audits in connection with the standards of the [PCAOB] (United States)]. . . .  In our

opinion, the consolidated financial statements . . . present fairly, in all material

respects, the financial position of Puda Coal, Inc., and subsidiaries as of December

31, 2009 . . . ."  (Id.)

C.    The 2010 Audit

MSHK also audited Puda's financial statements for the year ended December

31, 2010.  It did not obtain Shanxi Coal's SAIC filings in connection with its 2010

audit.  (Id. ¶ 81.)

MSHK received a CVR dated May 17, 2010, that reflected an infusion of

capital into Shanxi Coal by Putai and M. Zhao of over 466 million RMB; MSHK

obtained this CVR directly from Puda's management.  (Id. ¶¶ 84, 85.)  MSHK also

received a business license for Shanxi Coal that had been issued on May 26, 2010.

(Id. ¶ 84.)  The May 2010 CVR, like the one that MSHK had received in connection

with the 2009 audit, stated that it was valid for 90 days from its date of issuance.

---

[3] MSHK argues that the Court should disregard this document because plaintiffs have not
authenticated it or deposed legal counsel. For the same reasons set forth in footnote 2, the Court
disagrees that it is not properly before the Court on this motion.

(Id. ¶ 86.)  The CVR also listed the purported shareholders and their ownership interests in Shanxi Coal.  (Id. ¶ 88.)

The CVR contained the company and personal "chops"—a PRC equivalent to a signature—of the PRC public accountants who had issued the CVR.  (Id. ¶ 89.) The chops on the CVR were illegible, but the chops appeared legibly on attached Bank Deposit Receipts.  (Id.; Rosen Decl. Ex. 30, at GP-SUB-0011332.)

Shanxi Coal's May 2010 business license states on its face that any change in the "registered items" must be registered with the registration agency.  (MSHK 56.1 Resp. ¶ 92.)  Shanxi Coal's 2007 business license, on which MSHK relied in connection with its 2009 Audit, indicates that Shanxi Coal was a "limited liability company."  (Id. ¶ 93.)  Its 2010 business license contains different language and indicates that Shanxi Coal is a "limited liability company (stock controlled by natural person or private enterprise)."  (Id.)

MSHK relied on the form of legal opinion that was required to be issued to the underwriter in connection with Puda's public offering that closed in December 2010.  (Id. ¶ 94.)

MSHK provided a clean audit opinion in connection with its 2010 audit of Puda.  (Id. ¶ 99.)  Its opinion stated that the financial statements in Puda's Form 10-K "present fairly, in all material respects, the financial position of Puda Coal, Inc. and subsidiaries as of December 31, 2010 and 2009 . . . in conformity with accounting principles generally accepted in the United States of America."  (Id.)

Plaintiffs assert that the Auditors' reports were false and misleading because (1) Moore Stephens did not conduct its audits in accordance with PCAOB standards; (2) Puda's financial statements did not present fairly its financial position; (3) Puda did not present its financial statements in accordance with GAAP; and (4) Puda's internal controls were not effective but were instead plagued by significant material weaknesses. (SCAC ¶ 96.) MSHK's 2009 and 2010 audit reports both stated that MSHK conducted its audits of Puda's financial statements and internal controls "in accordance with the standards of the [PCAOB] (United States)." (Pls.' 56.1 Resp. ¶ 28.)

### D.    The Auditors' Resignation

On July 14, 2011, Puda filed a Form 8-K with the SEC announcing that MSHK had resigned as Puda's auditor. (Id. ¶ 100.) In a letter attached to that Form 8-K, MSHK announced that its 2009 and 2010 audit opinions could no longer be relied upon. (Id.)

### E.    Anita C.M. Hou

Plaintiffs have proffered Hou as an expert in Hong Kong and/or PRC generally accepted auditing standards. (Massengill Decl. Ex. 1 (Expert Report of Anita CM Hou ("Hou Rep.")), at ¶ 1.1.) Hou opines, inter alia, that:

1.  Similar concepts, rationale, and principles are adopted in the relevant auditing standards in the United States, PRC and Hong Kong;

2.  The fundamental question of control and ownership between parent and subsidiary companies was almost totally ignored;

3.  No specific audit procedures were designed and performed to counter or mitigate risks that Puda and Moore Stephens had

17

identified; rather, Moore Stephens relied heavily on the Audit Committee and/or Puda internal personnel to monitor these risks;

4. Moore Stephens obtained and relied on outdated and/or irrelevant audit evidence in forming its audit opinions;

5. The audit manager and/or partner left some key audit documents un-reviewed; and

6. Moore Stephens failed to heed red flags and/or failed to act on obvious red flags to assess, manage and/or mitigate potential risks.

(Id. ¶ 1.3.)  Hou states that her "opinions on the audit processes and procedures are focused on those generally applicable in auditing companies in the PRC / Hong Kong, referencing relevant auditing standards adopted / promulgated by Ministry of Finance in the PRC and Hong Kong Institute of Certified Public Accountants." (Id. ¶ 2.13.)  She also "cross-referenc[es] similar auditing standards adopted by the [PCAOB] in the United States for information purposes."  (Id.)

Hou was educated in Hong Kong and the United Kingdom and has been a member of the Hong Kong Institute of Certified Public Accountants since 1988. (MSHK 56.1 Resp. ¶ 101.)  Hou has never signed an audit opinion on a SEC-registered company.  (Id. ¶ 103; Pls.' 56.1 Resp. ¶ 224.)  She does not offer an opinion as to whether the 2009 and 2010 Audits complied with PCAOB standards. (Pls.' 56.1 Resp. ¶ 7.)  Hou testified at her deposition that she was not and is not "qualified to serve as an engagement partner on an audit of a U.S. registered company conducted in accordance with PCAOB standards."  (MSHK 56.1 Resp. ¶ 103; Pls.' 56.1 Resp. ¶ 224.)  She also testified that she is "not qualified to issue any opinion on PCAOB standards"; when plaintiffs' counsel asked her whether she could opine as to "whether the audits were conducted in accordance with PCAOB

18

standards," she responded that she "had no experience in looking at PCAOB engagement[s]" and therefore could not provide an opinion on that topic.  (Pls.' 56.1 Resp. ¶ 7.)

     F.    Alexander H. Mackintosh

Alexander H. Mackintosh has been a U.S. Certified Public Accountant ("CPA") since 1979.  (Id. ¶ 70.)  He began work at the accounting firm Ernst & Young LLP ("E&Y") in 1978 and was promoted to partner in 1988.  (Id. ¶ 71.)  In 1997, Mackintosh transferred to E&Y's office in Hong Kong, where he remained until his retirement in 2011.  (Id.)  Mackintosh has experience with PCAOB standards.  (Id. ¶ 74.)  After transferring to Hong Kong, he was involved in Schedule K reviews for U.S. registrants.  (Id. ¶ 73.)

Mackintosh has submitted an expert declaration in this case; plaintiffs deposed him on January 30, 2014.  (See generally Rosen Decl. Ex. 10 (Mackintosh Dep.); Mackintosh Rep.)  In his declaration, he has offered a variety of opinions regarding what PCAOB standards require and whether the Auditors' work for Puda met those standards.  In all respects, he opines that the Auditors' work complied with PCAOB standards.

Mackintosh opines, "PCAOB standards do not require that the auditor perform procedures that address every account in the financial statements, test every transaction or address every potential or theoretical way that accounts and financial statements may be misstated."  (Pls.' 56.1 Resp. ¶ 80.)  He also opines that MSHK planned both the 2009 and 2010 engagements in accordance with PCAOB standards and that the planning was sufficient to address the risks identified in

19

Puda's audit, including inherent and fraud risk.  (Id. ¶ 144.)  Mackintosh also

opines that "the planning procedures were appropriately supervised and approved

by the senior members of the [] engagement team," that MSHK's "assessment of

significant business processes was in accordance with PCAOB standards," and that

the MSHK's "procedures and conclusions relating to entity-level controls were in

accordance with PCAOB Standards."  (Id. ¶¶ 82, 97, 98.)

Mackintosh has opined that MSHK's "procedures and conclusions related to

related parties were in accordance with PCAOB Standards," and that "it was not

necessary or required under PCAOB standards that [MSHK] attempt to obtain

independent confirmations from the SAIC as part of its 2010 audit procedures."  (Id.

¶¶ 173, 190.)

G.    Peter S. Nurczynski

Peter S. Nurczynski has been proffered by MSPC as an accounting expert.

Nurczynski has submitted an expert report on the issue of whether MSPC

conducted a proper "Appendix K" review pursuant to SEC regulations.  (See

generally Decl. of Ottavio V. Mannarino ("Mannarino Decl.") Ex. C (Expert Report

of Peter S. Nurczynski ("Nurczynski Rep.")).)

Nurczynski is a U.S. CPA and worked for Ernst & Young for 38 years,

retiring in 2007.  (Id. at 3.)  He performed Appendix K reviews during that time.

(Id. at 4.)  He also provides background on the relevant SEC regulations and

professional standards regarding Appendix K reviews, as well as his opinion as to

how an auditor appropriately complies with such requirements.  (See generally id.)

For example, he states, "Appendix K does not require the Filing Reviewer to

perform audit steps, to review audit work papers, or to interact with the audit client. Accordingly, in order to complete a filing review, a Filing Reviewer necessarily relies on the work performed by the engagement team and the expertise of the engagement team." (Id. at 14.)

In his report, Nurczynski opines, "MSPC appropriately performed its Appendix K or Filing Review on behalf of MSHK with respect to Puda's 2009 and 2010 Form 10-k filings with the SEC." (Id. at 20.)

H.   Wang Weimin

MSHK has proffered Wang Weimin as an expert in PRC law. He is a lawyer who practices in the PRC and represents companies engaging in mergers, acquisitions and business transactions. (Massengill Decl. Ex. 3 (Expert Report of Wang Weimin ("Weimin Rep.")), at 1.) In connection with his work, he has conducted due diligence on target companies in the PRC; he is familiar with, inter alia, filing requirements in the PRC and the significance of the CVR. (Id. at 1, 2, 5–6.)

In his report, Weimin states that local SAIC offices maintain documents with differing degrees of consistency and that some "registration documents" and other filings are not available to the public. (Id. at 4.) He opines that searches of the SAIC's local offices often result in incomplete information. (Id. at 8.) Weimin also states that he has reviewed a CVR in this case and confirms what the CVR states on its face. (Id. at 6.) Weimin further discusses Shanxi's September 13, 2007 business license, and states that it was "effective until the next annual inspection in 2010 or the occurrence of an event necessitating the change of any essential

21

information in the business license, unless other events calling for retraction of the business license were to occur." (Id. at 7.)  Finally, Weimin is familiar with shareholder registers that PRC regulations require companies to maintain. He states that, under PRC law, shareholders are entitled to rely on the shareholder register.  (Id.)

## II.    APPLICABLE LEGAL PRINCIPLES

### A.  Summary Judgment

Summary judgment may not be granted unless a movant shows, based on admissible evidence in the record, "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of demonstrating "the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). On summary judgment, the Court must "construe all evidence in the light most favorable to the nonmoving party, drawing all inferences and resolving all ambiguities in its favor." Dickerson v. Napolitano, 604 F.3d 732, 740 (2d Cir. 2010).

Once the moving party has asserted facts showing that the nonmoving party's claims cannot be sustained, the "non-movant may defeat summary judgment only by producing specific facts showing that there is a genuine issue of material fact for trial." Samuels v. Mockry, 77 F.3d 34, 36 (2d Cir. 1996); see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009).  A "party may not rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," because "[m]ere conclusory allegations or denials . . . cannot by themselves create a genuine issue of material fact where none would otherwise

22

exist." Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010); see also Price v. Cushman & Wakefield, Inc., 808 F. Supp. 2d 670, 685 (S.D.N.Y. 2011) ("In seeking to show that there is a genuine issue of material fact for trial, the non-moving party cannot rely on mere allegations, denials, conjectures or conclusory statements, but must present affirmative and specific evidence showing that there is a genuine issue for trial.").

Only disputes relating to material facts—i.e., "facts that might affect the outcome of the suit under the governing law"—"will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986) (stating that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The Court should not accept evidence presented by the nonmoving party that is so "blatantly contradicted by the record . . . that no reasonable jury could believe it." Scott v. Harris, 550 U.S. 372, 380 (2007); see also Zellner v. Summerlin, 494 F.3d 344, 371 (2d Cir. 2007) ("Incontrovertible evidence relied on by the moving party . . . should be credited by the court on [a summary judgment] motion if it so utterly discredits the opposing party's version that no reasonable juror could fail to believe the version advanced by the moving party.").

B. Applicable Securities Law

Plaintiffs have alleged claims against the Auditors under both Section 11 of the Securities Act of 1933 and Section 10 of the Securities Exchange Act of 1934. One legal proposition governs both sets of claims: statements that are matters of

23

opinion must be "both objectively and subjectively false" at the time that they were made in order to be actionable. Fait v. Regions Fin. Corp., 655 F.3d 105, 111 (2d Cir. 2011); see also City of Omaha v. CBS Corp., 679 F.3d 64, 67–68 (2d Cir. 2012).

Additional elements are set forth below.

### 1. Section 11 of the Securities Act of 1933

Section 11 imposes "virtually absolute" liability where any part of a registration statement for a public offering "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." In re Morgan Stanley Info. Fund Sec. Litig., 592 F.3d 347, 358–59 (2d Cir. 2010) (quoting 15 U.S.C. § 77k). Such claims "do not require allegations of scienter, reliance, or loss causation." Fait, 655 F.3d at 109.

### 2. Section 10(b) and Rule 10b-5

For claims of securities fraud under Section 10(b) and Rule 10b-5, plaintiffs must adequately allege each of the following elements: (1) that defendants either made one or more misstatements of material fact or omitted to state a material fact that defendants had a duty to disclose; (2) that defendants made this misstatement or omission with scienter; (3) that defendants made this misstatement or omission in connection with the purchase or sale of securities; (4) that one or more plaintiffs relied upon the misstatement or omission; and (5) that such reliance was the proximate cause of a plaintiff's loss (i.e., loss causation). See Lentell v. Merrill Lynch & Co., 396 F.3d 161, 172 (2d Cir. 2005); In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998).

24

### a) "Maker" of a statement

For a section 10(b) claim, only the "maker of a statement" may be held liable. See Janus Capital Group v. First Derivative Traders, 131 S. Ct. 2296, 2302 (2011) ("One 'makes' a statement by stating it. . . . For purposes of Rule 10b-5, the maker of a statement is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.").

### b) Scienter

Scienter describes "a mental state embracing an intent to deceive, manipulate, or defraud" that characterizes the maker of a statement. See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 319, 323 (2007). In the Second Circuit, to plead scienter, plaintiffs "may (1) allege facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness, or (2) allege facts to show that defendants had both motive and opportunity to commit fraud." Rothman v. Gregor, 220 F.3d 81, 90 (2d Cir. 2000).

Conscious misbehavior generally "encompasses deliberate, illegal behavior." Novak v. Kasaks, 216 F.3d 300, 308 (2d Cir. 2000). Recklessness refers to conduct that "is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." S. Cherry Street, LLC v. Hennessee Grp. LLC, 573 F.3d 98, 109 (2d Cir. 2009); see also Novak, 216 F.3d at 308; Chill v. Gen. Elec. Co., 101 F.3d 263, 269 (2d Cir. 1996) ("An egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of . . . recklessness.").

Recklessness, "an extreme departure from the standard of ordinary care," supports an inference that the danger was "either known to the defendant or so obvious that the defendant must have been aware of it." Rothman, 220 F.3d at 90; see also Novak, 216 F.3d at 308–09. "Where plaintiffs contend defendants had access to contrary facts, they must specifically identify the reports or statements containing this information." Id. at 309.

In the context of a non-fiduciary accounting firm, such as the Auditors here, in order to raise a triable issue as to scienter based on reckless conduct, a plaintiff must proffer facts that such conduct was "'highly unreasonable,' representing 'an extreme departure from the standards of ordinary care.' It must, in fact, approximate an actual intent to aid in the fraud being perpetrated by the audited company." Rothman, 220 F.3d at 98 (quoting Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 120–21 (2d Cir. 1982)).

To support an inference of scienter by a non-fiduciary accountant, a plaintiff must proffer facts suggesting far more than simply an audit that could have been better. Rather, the audit must have been so shoddy that it was a "pretend" audit— an audit that in effect was not performed at all. See Rothman, 220 F.3d at 98; see also In re Worlds of Wonder Sec. Litig., 35 F.3d 1407, 1426 (9th Cir. 1994); McLean v. Alexander, 599 F.2d 1190, 1198 (3d Cir. 1979); SEC v. Price Waterhouse, 797 F. Supp. 1217, 1240 (S.D.N.Y. 1992) ("The SEC must prove that the accounting practices were so deficient that the audit amounted to no audit at all, or an egregious refusal to see the obvious, or to investigate the doubtful, or that the

accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts.") (citations and internal quotation marks omitted).

Facts merely supporting an inference that an audit could have been done better constitute "fraud by hindsight" and do not support the requisite scienter. Meridian Horizon Fund, LP, v. KPMG (Cayman), KPMG LLP, 487 F. App'x. 636, 640 (2d Cir. 2012) (citing Novak, 216 F.3d at 309).

i.   The standard of care

A trier of fact's determination of an accountant's scienter is measured against the applicable standard of care: did the accountant's conduct exceed, meet, fall short of, or represent an egregious departure from what others in the field would expect?

There is no rule that expert testimony is required in order to establish the applicable standard of care. Cf. United States v. Rigas, 490 F.3d 208, 220–21 (2d Cir. 2007) (finding that expert testimony regarding GAAP requirements was not required; because a violation of GAAP was not an element of the offense, a jury could have found securities fraud even without finding such a violation); see also United States v. Ebbers, 458 F.3d 110, 125–26 (2d Cir. 2006) ("The government is not required in addition to prevail in a battle of the expert witnesses over the application of individual GAAP rules."). This is consistent with the general principle that violations of GAAP or Generally Accepted Auditing Standards ("GAAS") without a corresponding fraudulent intent are insufficient to establish securities fraud, or even to state a claim. See Chill, 101 F.3d at 270; In re Worlds of

27

Wonder, 35 F.3d at 1426 (explaining that even deliberate violations of GAAP and GAAS, without more, do not amount to fraud); accord Marksman Partners, L.P. v. Chantal Pharm. Corp., 46 F. Supp. 2d 1042, 1046 (C.D. Cal. 1999); In re Health Mgmt. Inc. Sec. Litig., 970 F. Supp. 192, 203 (E.D.N.Y. 1997).

The question for the Court is whether, in the case before it, the degree of skill that an accountant must use is a matter within the knowledge and expertise of a lay juror. See McKowan Lowe & Co. v. Jasmine, Ltd., Nos. 94-cv-5522 (RBK), 96-cv-2318 (RBK), 2005 WL 1541062, at *14 (D.N.J. 2005) (finding that a failure to provide expert evidence that auditor's conduct was reckless or egregious and that no reasonable auditor would have made the same decisions if confronted with the same facts entitled a defendant auditor to summary judgment).

In accounting malpractice cases, in which a mere negligence standard could be sufficient to establish liability, expert testimony is typically required. See, e.g., SG Indus. v. McGladrey, Inc., No. 10-cv-11119, 2011 WL 6090247, at *5 (E.D. Mich. Dec. 7, 2011) (granting the defendant's motion for summary judgment because the plaintiff had failed to establish the applicable standard of care in an accounting malpractice action, and stating that the plaintiff could not rely on defendant's expert to establish the standard of care); Dapremont v. Overcash, Walker & Co., No. 99-cv-353 (BH), 2000 WL 1566532, at *5 (S.D. Ala. Oct. 4, 2000); Hodge v. District of Columbia Housing Finance Agency, No. 92-cv-2347 (LFO), 1993 WL 433601, at *1 (D.D.C. 1993) (in an accounting malpractice case, expert testimony was necessary to establish applicable standard of care "unless common knowledge warrants an

inference of negligence"); Estate of Nevelson v. Carro, Spanbock, Kaster & Cuiffo, 686 N.Y.S.2d 404, 405–06 (App. Div. 1st Dep't 1999) ("Generally, plaintiffs in professional malpractice actions proffer expert opinion evidence on the duty of care to meet their burden of proof in opposition to a properly supported summary judgment motion.  However, the requirement that plaintiff come forward with expert evidence on the professional's duty of care may be dispensed with where ordinary experience of the fact finder provides sufficient basis for judging the adequacy of the professional service.") (citations and internal quotation marks omitted).

  C. Legal Standards Regarding Expert Testimony: Daubert

  "[E]xpert testimony may help a jury understand unfamiliar terms and concepts." United States v. Bilzerian, 926 F.2d 1285, 1294 (2d Cir. 1991).  A trial court has an obligation, however, to act as a gatekeeper with respect to expert testimony.  See Daubert v. Merrell Dow Pharms., Inc., 509 U.S. 579, 597 (1993); see also Major League Baseball Props., Inc. v. Salvino, Inc., 542 F.3d 290, 311 (2d Cir. 2008).  This is due in large part to the fact that an expert is "permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observation." Daubert, 509 U.S. at 592.  The court's role as a gatekeeper is therefore necessary.

  "The primary locus of this obligation is [Federal Rule of Evidence] 702, which clearly contemplates some degree of regulation of the subjects and theories about which an expert may testify." Daubert, 509 U.S. at 589.  Rule 702 provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. Thus, this Court's inquiry into whether an expert meets Rule 702's requirements includes a review of (1) the qualifications of the proposed expert; (2) whether each proposed opinion is based upon reliable data and reliable methodology; and (3) whether the proposed testimony would be helpful to the trier of fact. See, e.g., Nimely v. City of New York, 414 F.3d 381, 396–97 (2d Cir. 2005); Arista Records LLC, et al. v. Lime Grp. LLC, et al., No. 06-cv-5936 (KMW), 2011 WL 1674796, at *1 (S.D.N.Y. May 2, 2011).

The "overarching subject" or the Rule 702 inquiry is "the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions they generate." Daubert, 509 U.S. at 595.

However, even otherwise qualified experts may not simply offer conclusory opinions. Major League Baseball, 542 F.3d at 311; Bridgeway Corp. v. Citibank, 201 F.3d 134, 142 (2d Cir. 2000). Conclusory opinions are a form of "ipse dixit," and often provide an insufficient basis upon which to assess reliability. See, e.g., Nimely, 414 F.3d at 396.

Expert testimony, like all evidence, is also subject to the requirements of Rule 403, which provides that otherwise relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Id. (quoting Fed. R. Evid. 403). In Daubert, the Supreme Court "noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations." See Nimely, 414 F.3d at 397.

### 1.    Qualifications

Inquiry into a proposed expert's qualifications is a threshold question that seeks to determine whether the proposed expert is, in fact, an expert at all in the area in which he or she intends to testify. See Daubert, 509 U.S. at 592 n.10; Arista Records, 2011 WL 1674796, at *2. Put simply, without the requisite qualifications, the reliability of a proposed expert's testimony is in serious doubt.

Whether a proposed expert is qualified depends on his or her educational background, training, and experience in the field relevant to the opinions that he or she seeks to express. See id.; see also United States v. Tin Yat Chin, 371 F.3d 31, 40 (2d Cir. 2004) ("To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony."); Cary Oil Co., Inc. v. MG Refining & Mktg., Inc., No. 99-cv-1725 (VM), 2003 WL 1878246, at *2 (S.D.N.Y. Apr. 11, 2003).

In the Second Circuit, courts have construed the inquiry into an expert's qualifications with an eye towards the "liberal thrust" of the Federal Rules and

31

their "general approach of relaxing the traditional barriers to 'opinion' testimony."
See Daubert, 509 U.S. at 588–89; In re Rezulin Prods. Liab. Litig., 309 F. Supp. 2d
531, 559 (S.D.N.Y. 2004) ("The Second Circuit has taken a liberal view of the
qualification requirements of Rule 702, at least to the extent that a lack of formal
training does not necessarily disqualify an expert from testifying if he or she has the
equivalent relevant practical experience."). If an expert's training and experience
are in a field closely related to the area to the proposed testimony, that may, in
appropriate circumstances, be sufficient to meet Rule 702's qualification standards.
See Arista Records, 2011 WL 1674796, at *3; Johnson & Johnson Vision Care, Inc.
v. CIBA Vision Corp., No. 04-cv-7369 (LTS), 2006 WL 2128785, at *6 (S.D.N.Y. July
28, 2006).

     2.   Reliability

The reliability of a proposed expert's testimony "entails a preliminary
assessment of whether the reasoning or methodology underlying the testimony is
scientifically valid and whether that reasoning or methodology properly can be
applied to the facts in issue." Daubert, 509 U.S. at 592–93. Among the questions to
be answered are whether the theory or methodology can be tested, whether it has
been subjected to peer review, whether it has a potential rate of error, and whether
there is "general acceptance" of the methodology or theory. Id. at 593–94.

There are, however, limitations that a court can, and indeed sometimes must,
place upon even a qualified expert proposing to testify as to some admissible
opinions. For instance, the court may preclude an expert from testifying as to the
credibility of other witnesses or evidence. See United States v. Scop, 846 F.2d 135,

142 (2d Cir.), <u>modified on reh'g</u>, 856 F.2d 5 (2d Cir. 1988); <u>In re Blech Secs. Litig.</u>, No. 94-cv-7696 (RWS), 2003 WL 1610775, at *21 (S.D.N.Y. Mar. 26, 2003); <u>Linkco, Inc. v. Fujitsu Ltd.</u>, No. 00-cv-7242 (SAS), 2002 WL 1585551, at *2 (S.D.N.Y. July 16, 2002).

Furthermore, an opinion that is speculative or conjectural does not satisfy Rule 702. <u>See</u> <u>Daubert</u>, 509 U.S. at 590 ("[T]he word 'knowledge' connotes more than subjective belief or unsupported speculation."). Thus, proffered "expert testimony should be excluded if it is speculative or conjectural." <u>Major League Baseball</u>, 542 F.3d at 311. While the <u>Daubert</u> inquiry is "flexible" and intended to give the Court the "discretion needed to ensure that the courtroom door remains closed to junk science," it is also true that, to warrant admissibility, "it is critical that an expert's analysis be reliable at every step." <u>Amorgianos v. Nat'l R.R. Passenger Corp.</u>, 303 F.3d 256, 267 (2d Cir. 2002).

### 3.  Helpfulness to the trier of fact

Expert testimony must be helpful to, but not usurp the province of, the trier of fact. <u>Bilzerian</u>, 926 F.2d at 1294; <u>Marx & Co. v. Diners' Club, Inc.</u>, 550 F.2d 505, 512 (2d Cir. 1977).

Federal Rules of Evidence 401, 402, and 403 govern the inquiry of whether an individual qualified as an expert, using reliable methodologies, is proffering testimony that is both admissible and should be allowed. Rule 403, which provides for the exclusion of otherwise relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues,

or misleading the jury," is applicable to the Court's inquiry in this regard. <u>Daubert</u>, 509 U.S. at 595 (quoting Fed. R. Evid. 403).

Furthermore, expert testimony may not usurp the province of the judge to instruct on the law, or of the jury to make factual determinations. <u>See</u> <u>Bilzerian</u>, 926 F.2d at 1294; <u>Marx & Co.</u>, 550 F.2d at 510–11. While an expert "may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts." <u>Bilzerian</u>, 926 F.2d at 1294. Moreover, "[a]lthough testimony concerning the ordinary practices in [an] industry may be received to enable the jury to evaluate a defendant's conduct against the standards of accepted practice, <u>Marx</u>, 550 F.2d at 509, testimony encompassing an ultimate legal conclusion based upon the facts of the case is not admiss[i]ble, and may not be made so simply because it is presented in terms of industry practice." <u>Id.</u> at 1295.

### 4.   "Rebuttal" Experts

Federal Rule of Civil Procedure 26 sets forth the basic rules, which may be modified by court order, governing the disclosure of testifying experts. Fed. R. Civ. P. 26(a)(2).

Rule 26 provides that "a party <u>must</u> disclose to the other parties the identity of any witness it may use at trial." Fed. R. Civ. P. 26(a)(2)(A) (emphasis added). Furthermore, "[u]nless otherwise stipulated or ordered by the court, this disclosure must be accompanied by a written report." Fed. R. Civ. P. 26(a)(2)(B). "A party must make these disclosures at the times and in the sequence that the court orders. Absent a stipulation or a court order, the disclosures must be made . . . (ii) if the

evidence is intended solely to contradict or rebut evidence on the same subject matter identified by another party under Rule 26(a)(2)(B) . . ., within 30 days after the other party's disclosure." Fed. R. Civ. P. 26(a)(2)(D).  In addition, the rule provides for supplementing these disclosures.  Fed. R. Civ. P. 26(a)(2)(E).

Evidence can be divided into two categories: that which goes to proof of a party's case in chief, and that which responds or rebuts evidence of an adverse party.  See, e.g., Allen v. Prince George's County, 737 F.2d 1299, 1305 (4th Cir. 1984) ("Ordinarily, rebuttal evidence may be introduced only to counter new facts presented in the defendant's case in chief.") (citing John Henry Wigmore, Evidence in Trials at Common Law § 1873 (1976)).  It is typically the case that evidence presented in defense to a claim would be "rebuttal" evidence; if it is not, it would be, in effect, irrelevant under Rule 401.  Of course, a plaintiff may himself proffer rebuttal evidence to counter evidence offered by a defendant to defeat the plaintiff's claim.

To determine whether evidence is "rebuttal" evidence, a court must ask whether the rebuttal evidence is proffered to counter evidence that the defendant has offered, or whether it is simply a continuation of the plaintiff's case in-chief.  See Marmo v. Tyson Fresh Meats, Inc., 457 F.3d 748, 759 (8th Cir. 2006) (finding that the district court acted within its discretion to deny the plaintiff's application to re-designate a rebuttal expert as a case-in-chief expert, two years after the defendant challenged the plaintiff's expert as improperly designated as a "rebuttal" expert when his opinions addressed an element of plaintiff's claim).  If the adverse

35

party has not raised an issue to which such evidence is responsive, it is not "rebuttal" evidence.  See id.; United States v. Neary, 733 F.2d 210, 219–20 (2d Cir. 1984) (rejecting the introduction of certain evidence as improper rebuttal evidence); Casey v. Seas Shipping Co., 178 F.2d 360, 362 (2d Cir. 1949) ("Assuming . . . that the evidence was not admissible in rebuttal as of right, it might of course have been excluded.").

"It is well settled that [a] district court has wide discretion in determining whether to permit evidence on rebuttal.  [W]hether testimony should be allowed on rebuttal is a matter so clearly within the discretion of the judge . . . that we think no more need be said." Koseatac v. Rubin, 4 F. App'x 84, 86 (2d Cir. 2001) (alterations in original) (citations and internal quotation marks omitted).

III.   MOTIONS DIRECTED AT THE EXPERTS

In deciding a motion for summary judgment, a court may consider only admissible evidence.  Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997).  When a party offers expert declarations in support of its position, and a motion has been made to exclude such expert, a court must decide that motion first, in order to determine whether such testimony may be considered in connection with summary judgment.  See id.  "This is true even if the exclusion of expert testimony would be outcome-determinative." Berk v. St. Vincent's Hosp. & Med. Ctr., 380 F. Supp. 2d 334, 351 (S.D.N.Y. 2005).

In connection with the summary judgment motions before this Court, plaintiffs rely heavily on Hou to establish the professional standards that the Auditors should have met, and to establish the reasonableness of the particular

36

steps the Auditors took in connection with their work.  Plaintiffs had previously disclosed to defendants, and then pulled, another proposed expert on accounting standards, Barry Epstein.  (See Massengill Decl. Exs. 5, 87; Pls.' Mem. of L. in Supp. of Mot. to Exclude Mackintosh ("Pls.' Mackintosh Mot.") 2 n.1.)  The Auditors deposed Epstein; shortly thereafter, and prior to the date when the Auditors were to disclose rebuttal experts, plaintiffs made a strategic decision to pull Epstein and proceed solely with Hou.  According to plaintiffs, Epstein's absence has rendered Nurczynski and Mackintosh moot, because they are only "rebuttal" experts, and Epstein is no longer in need of being rebutted.

The Auditors also seek to offer Weimin.  In response, plaintiffs argue that Weimin does not have experience directly relevant to this case and therefore his opinions are based on ipse dixit alone.

A.    Hou

Plaintiffs allege that the Auditors committed securities fraud under Section 10(b) and Rule 10b-5.  Defendants have moved for summary judgment on that claim on the basis, inter alia, that plaintiffs have failed to raise a triable fact as to the necessary element of scienter.

Plaintiffs do not assert that direct evidence shows that the Auditors intentionally engaged in securities fraud.  Instead, plaintiffs claim that the Auditors' conduct was reckless—that its conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care," and approximating "an actual intent to aid in the fraud being perpetrated by the audited company."  Rothman, 220 F.3d at 98 (internal quotation marks omitted).

This Court's obligation as gatekeeper requires that it determine whether the opinions Hou seeks to offer are relevant to the case, and whether she has the requisite expertise to offer them.  See Daubert, 509 U.S. at 593 n.10; Nimely, 414 F.3d at 396–97.  As with all evidence, Hou's opinions are relevant to this case only to the extent they "make a fact at issue more or less probable than it would be without" her opinions.  Fed. R. Evid. 401; see Daubert, 509 U.S. at 587 ("'Relevant evidence' is defined as that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probably or less probable than it would be without the evidence.'"); In re Fosamax Prods. Liab. Litig., 509 F. App'x 69, 74 (2d Cir. 2013) (finding that the district court properly barred an expert opinion that was not relevant to the claims tried to the jury); Jackson v. Harsch, 116 F.3d 465, 465 (2d Cir. 2007) (same).

It is clear that the relevant standard of care against which the Court must measure the Auditors' conduct to evaluate scienter is that of an auditor conducting an audit under the PCAOB (United States) standards.  Those are the standards to which MSHK refers in its 2009 and 2010 audit opinion letters; those are the standards alleged that the SCAC alleges were breached; those are the standards to which plaintiffs repeatedly refer in their filings on these motions.  (See, e.g., Pls.' 56.1 Resp. ¶ 28; MSHK 56.1 ¶¶ 24, 83.)

Plaintiffs have proffered Hou as an expert in Hong Kong and/or PRC generally accepted auditing standards.  (Hou Rep. ¶ 1.1.)  In support of Hou's opinion, plaintiffs argue that MSHK's expert, Mackintosh, has not "indicate[d] that

PCAOB, Hong Kong, and PRC standards differ in any way with respect to the audit procedures confirming non-routine transactions"; that "sufficient evidence" is required to justify audit conclusions; and that Hou has experience with books and records in the PRC. (Pls.' Mem. of L. in Opp. to Def. Moore Stephens's Mot. to Exclude Hou ("Pls.' Hou Opp.") 3.) According to plaintiffs, "although not a CPA in the United States, Ms. Hou can provide plenty of relevant information on the issue of evidence of ownership of a PRC-based company such that the jury can find the facts necessary to support a determination that it was reckless for the Auditors not have found that the business was gone." (Id. at 4.)

This Court does not find that Hou has the necessary expertise to offer any opinions on the only relevant standard of care applicable to Auditors in this case: the standard of care applicable to auditors conducting an audit of a U.S. registered company pursuant to PCAOB standards. She has herself never conducted such an audit, she does not have the requisite training, and she herself concedes that she lacks qualifications to opine in this area. (Pls.' 56.1 Resp. ¶¶ 7, 224; MSHK 56.1 Resp. ¶¶ 101, 103.) Even under the relatively liberal standards governing expert qualifications in the Second Circuit, Hou's qualifications are inadequate. See Daubert, 509 U.S. at 592 n.10; Tin Yat Chin, 371 F.3d at 40; Arista Records, 2011 WL 1674796, at *2; Johnson & Johnson Vision Care, 2006 WL 2128785, at *6; Cary Oil Co, 2003 WL 1878246, at *2. It is not a matter of "not enough" expertise on PCAOB standards; rather, it is that she has none. Accordingly, this Court does not believe that Hou will "help the trier of fact . . . to determine" whether the Auditors'

conduct fell egregiously short of the applicable standard of care.  Fed. R. Evid. 702;

see also Nimely, 414 F.3d at 396–97.  Hou's opinions regarding auditing standards

applicable to Hong Kong and PRC audits are simply not relevant to any issue

requiring determination in this case.  Thus, her opinions—based on the relevant

expertise she does have, relating to Hong Kong and PRC auditing standards—are

irrelevant and excluded under Rule 402 of the Federal Rules of Evidence.

While it is true that Hou has opined that the standards for Hong Kong, PRC

and "United States" audits are "similar" (Hou Rep. ¶¶ 1.3, 2.18, 5.5–5.7, 6.1), that is

insufficient to render her expertise relevant and opinions both relevant and reliable.

As an initial matter, it is not clear whether the "auditing standards in the United

States" to which Hou refers are PCAOB standards only, or whether she intends to

include other standards as well; it is therefore unclear which standards are

"similar" to others.  (See id.)  Because Hou opines generally that "[s]imilar concepts,

rationale, and principles" are used in the two sets of standards, it is also entirely

unclear whether Hou intends "similarity" of standards to mean "equivalence"—and,

if so, equivalent in all respects or only some respects.  (See id. at ¶ 1.1.)  This is, of

course, highly relevant to the question of whether reference to auditing procedures

under Hong Kong and PRC standards have any bearing on PCAOB standards.  It is

not the case that, simply because Shanxi Coal is a PRC-based company, the

Auditors' conduct must be assessed against PRC- or Hong Kong-based standards in

this securities action.

To the extent that Hou could provide information relating to bookkeeping and recordkeeping in Hong Kong or the PRC, those statements are buried within her views as to whether the Auditors did or did not perform steps under the Hong Kong and PRC standards against which she was measuring their conduct. (See generally id. ¶¶ 9.1–10.28.) Hou's opinions run the very real risk of misleading the jury as to the applicable standard of care. In addition, the Court will not allow Hou's statements relating to books and records (for instance, SAIC records and the CVRs) to be detached from Hou's broader opinions and presented alone, as there is similarly a real risk of "confusion of the issues, or misleading the jury" as to the applicable standard of care for auditors. See Nimely, 414 F.3d at 396 (quoting Fed. R. Evid. 403).

If plaintiffs were offering a separate expert in PCAOB standards and proffering Hou as a secondary expert, the Court would consider whether a cautionary instruction would resolve potential confusion. However, plaintiffs are not offering any expert on PCAOB standards; Hou would testify as plaintiffs' "accounting expert" in their case in chief. Under such circumstances, the risk is real and great that a factfinder would take Hou's opinions as setting the standard of care against which the Auditors' conduct should be measured.

In the absence of relevant expertise, Hou's opinions that assert that the Auditors performed inadequately are unreliable. See Daubert, 509 U.S. at 595 (citing Fed. R. Evid. 702); Nimely, 414 F.3d at 396–97; Arista Records, 2011 WL 1674796, at *1. Reliability is a question of methodology; here, the basis of Hou's

methodology, her application of Hong Kong and PRC accounting standards, is an inappropriate starting point.[4]

For these reasons, MSHK's motion to exclude Hou's expert report and testimony and MSHK's motion to strike Hou's declarations are GRANTED.

B.    Mackintosh and Nurczynski

Plaintiffs' primary argument in support of excluding Mackintosh and Nurczynski is procedural: that both are "case-in-chief" experts and should have been disclosed on the date for disclosure of such experts rather than on the date for disclosure of "rebuttal" experts.  This argument takes on particular significance in light of plaintiffs' strategic decision not to proffer an expert on PCAOB or Appendix K standards as part of their case in chief.  Plaintiffs instead proffered Hou, an expert in Hong Kong and/or PRC auditing standards that are not at issue in this case.

---

[4] On March 28, 2014, in opposition to the Auditors' motions for summary judgment, Hou also submitted two separate declarations, the so-called "Summary Judgment Declaration" and "Documentation Declaration."  On May 7, 2014, defendants moved to strike those declarations as a procedurally improper attempt to amend her expert report; plaintiffs assert that experts may submit separate declarations on summary judgment, and this is just that.  Hou's Summary Judgment Declaration is struck.  The law leaves no doubt that this Court should only consider on summary judgment admissible evidence.  Raskin, 125 F.3d at 66.  Because Hou did not include PCAOB-based opinions in her expert report—she only provided certain comparisons to PCAOB standards for informational purposes—she is precluded from now attempting to testify to the opinions in her "summary judgment" declaration.  Accordingly, such testimony is inadmissible, and this Court may not rely on it in deciding the summary judgment motions.  In addition, the Court finds that Hou's own prior admissions as to a lack of expertise in PCAOB standards (see Pls.' 56.1 Resp. ¶¶ 7, 224; MSHK 56.1 Resp. ¶ 101, 103) contradict with her statement in her Summary Judgment Declaration that she "could competently testify to the facts" that she sets forth (Decl. of Anita CM Hou Dated Mar. 28, 2014 ¶ 3).  Thus, MSHK's motion to strike Hou's Summary Judgment Declaration of March 28, 2014 is GRANTED.  MSHK's motion to strike Hou's Documentation Declaration of March 28, 2014 is DENIED as moot in light of the Court's preclusion of her proposed expert testimony more generally.

Plaintiffs' procedural argument is unavailing. The Court notes that plaintiffs have had a full and fair opportunity to depose both Mackintosh and Nurczynski and therefore will not be sandbagged at trial. See Haas v. Del. & Hudson Ry. Co., 282 F. App'x 84, 86 (2d Cir. 2008) (discussing the "practice of 'sandbagging' an opposing party with new evidence"). Both experts would provide testimony that addresses core issues in this case: whether MSHK and MSPC complied with the relevant standard of care. This expert testimony proffered by the Auditors, as defendants, undoubtedly counters and rebuts plaintiffs' claim that the Auditors' conduct fell egregiously short. See, e.g., Weiss v. Chrysler Motors Corp., 515 F.2d 449, 458–59 (2d Cir. 1975) (finding that the district court should have admitted expert testimony as rebuttal evidence, even if the evidence could have been admissible on the case in chief).

Plaintiffs' procedural argument—that, because they chose to withdraw their accounting expert on the same topics, there is no role for the Auditors' rebuttal experts—is misguided. If plaintiffs were correct, then the sequence of exchanging expert reports would grant plaintiff a unilateral veto right over the type of proof the Auditors may offer in their own defense. There is no legal basis for such a position. So long as plaintiffs assert that the Auditors breached their standard of care, the Auditors are entitled to defend against that claim. See, e.g., United States v. Barrow, 400 F.3d 109, 120 (2d Cir. 2005) (discussing the appropriate scope of rebuttal evidence); United States v. Tejada, 956 F.2d 1256, 1256 (2d Cir. 1992) (explaining that a "district court has wide discretion over what evidence may be

presented on rebuttal"). If plaintiffs were to drop their claim, then these two witnesses would be unnecessary, and so would be these motions.

In addition, the Court views plaintiffs' decision to withdraw its primary accounting expert as a tactical decision, and one that plaintiffs are no doubt entitled to make. However, they cannot withdraw their expert and expect that they can thereby achieve a secondary benefit of controlling the Auditors' expert choices. If plaintiffs had disclosed to the Auditors during negotiations over the stipulation regarding the manner and timing of the exchange of reports that they did not intend to submit an accounting expert on PCAOB standards, and then the Auditors submitted the Mackintosh and Nurczynski reports as rebuttal reports, then plaintiffs' procedural argument might have some traction. However, as the Court understands the timing of events here, there was no such prior disclosure. In fact, plaintiffs originally intended to, and did, submit a primary accounting expert report from Epstein. (See Massengill Decl. Ex. 5.) Having deposed Mackintosh and Nurczynski, plaintiffs will not be sandbagged at trial.

Finally, the Court notes that Mackintosh and Nurczynski do, in fact, address opinions proffered by Hou; both experts address the same subject matter as Hou, including Appendix K procedures and MSPC and MSHK's compliance with auditing standards. See, e.g., SEC v. Badian, No. 06-cv-2621 (LTS) (DFE), 2009 WL 5178537, at (S.D.N.Y. Dec. 23, 2009) (explaining that a rebuttal expert "is free to support his opinions with evidence not cited in" an opposing expert's "reports so long as he rebuts the same 'subject matter' identified in those reports"). In that

44

sense, Mackintosh and Nurczynski are "rebuttal" experts in the manner described by plaintiffs.  The Court is mindful that it is precluding Hou.  However, as in many cases in which one side's expert is excluded and another's is not, the preclusion of one party's expert does not result in the automatic preclusion of the adverse party's expert on similar topics.

For these reasons, plaintiffs' motions to exclude Mackintosh and Nurczynski are DENIED.

C.    Weimin

Weimin is a lawyer who is actively practicing in the PRC.  (Weimin Rep. 1.) He has personal experience with the type and purpose of certain documents referenced as part of plaintiffs' case.  (Id. at 1, 2, 5–6.)  The Court is unaware of another witness who would provide the type of explanatory testimony that Weimin proposes to provide.  The Court thus finds by a preponderance of the evidence (1) that he is qualified to offer the limited opinions in his report, (2) that they are not ipse dixit but instead based on his experience with these types of documents, and (3) that such testimony will be helpful to the trier of fact.  See Nimely, 414 F.3d at 396–97 (citing Fed. R. Evid. 702).

Additional points that plaintiffs raise—regarding whether Weimin himself ever sought documents directly from the SAIC local office that possessed certain documents relevant to this case, and whether he would have himself relied on the CVRs at issue here—are questions best left for cross-examination.

Plaintiffs' motion to exclude Weimin is DENIED.

45

IV.    SUMMARY JUDGMENT MOTIONS

The Auditors assert several grounds in support of their motions for summary judgment.

The Auditors argue that there is no triable issue as to whether they acted with the requisite scienter or subjective falsity.[5]  See Tellabs, 551 U.S. at 319, 323; Rothman, 220 F.3d at 90; Novak, 216 F.3d at 308.  In addition, MSPC argues that it was also not a "maker" of any of the statements under the Supreme Court's decision in Janus, 131 S. Ct. at 2302.  This Court agrees with each of these arguments.

A.    Scienter

Plaintiffs do not allege that the Auditors had actual knowledge of the Zhao brothers' fraud, but rather that they conducted an inadequate audit and missed red flags.  This claim requires a showing of reckless conduct—indeed, of "shoddy accounting practices" that fell so egregiously short of the applicable professional standards of care as to amount to "a pretended audit" or no audit at all.  Rothman, 220 F.3d at 98.  To defeat the Auditors' motion for summary judgment based on lack of requisite scienter, plaintiffs must therefore raise a triable issue as to whether the Auditors' conduct fell egregiously short of applicable standards.

Plaintiffs have not raised a triable issue on this question.  Expert testimony is not always required to establish a standard of care.  See, e.g., Rigas, 490 F.3d at 220–21; Ebbers, 458 F.3d at 125–26.  However, when the standard of care is one with which a reasonable lay juror is familiar, such testimony may be necessary.

---

[5] MSHK makes the primary arguments on these issues; MSPC "adopts" MSHK's arguments.  (Def. MSPC's Mem. of L. in Supp. of Mot. for Summ. J. ("MSPC Mot.") 7–8.)

<u>See, e.g.</u>, <u>SG Indus.</u>, 2011 WL 6090247, at *5; <u>McKowan Lowe</u>, 2005 WL 1541062, at *14; <u>Dapremont</u>, 2000 WL 1566532, at *5; <u>Hodge</u>, 1993 WL 433601, at *1; <u>Nevelson</u>, 18 N.Y.S.2d at 947.  This is such a case.  Plaintiffs themselves concede that the adequacy of the Auditors' conduct with respect to their work for Puda is "foreign to a jury." (Pl.'s Hou Opp. 11.)  This Court agrees.

It is certainly true that the issue that plaintiffs assert that the Auditors failed to catch can be readily summarized in a manner comprehensible to the layperson: the company that MSHK was auditing had been transferred away; Puda no longer owned Shanxi Coal, and yet claimed it did.  However, that concise summary obscures the more complicated question of whether the Auditors failed to exercise the appropriate professional standard of care—and indeed fell "egregious[ly]" short of such a standard, <u>Chill</u>, 101 F.3d at 269—in conducting procedures which failed to uncover that fact.

As discussed above, MSHK stated that it conducted its audits in compliance with PCAOB standards; the SCAC alleges that the audits failed to comply with PCAOB standards; and the plaintiffs' statements of material facts repeatedly assert that the Auditors failed to comply with PCAOB standards.  (SCAC ¶¶ 24; Pls.' 56.1 Resp. ¶¶ 28, 61; MSHK 56.1 ¶¶ 83, 99.)  In short, it is crystal-clear that the professional standards of care against which the Auditors' conduct must be measured are PCAOB standards.  See <u>S. Cherry Street</u>, 573 F.3d at 109 (explaining that the conduct in question must have been an "extreme departure from the standards of ordinary care").

Plaintiffs have put forth no admissible evidence as to what PCAOB standards the Auditors failed to comply with; nor have they offered any admissible evidence that their conduct not only failed but egregiously failed to meet those standards. Indeed, to raise a triable issue as to recklessness, plaintiffs must put forth facts that could lead to an inference that, under the applicable PCAOB standards, the Auditors' practices constituted "shoddy accounting practices" that fell so egregiously short of the applicable professional standards of care as to amount to "a pretended audit" or no audit at all. Rothman, 220 F.3d at 98. Plaintiffs have not made any showing in this regard at all.

Instead, for tactical reasons best known to themselves, plaintiffs withdrew the only accounting expert they had on PCAOB standards, Barry Epstein. (Massengill Decl. Exs. 5, 87; Pls.' Mackintosh Mot. 2 n.1.) They were left with Hou, an accountant perhaps skilled in audits using other standards—those of Hong Kong or the PRC—but not PCAOB standards. (See Hou Rep. ¶ 1.1.) Hou herself conceded that she was not offering, and was not qualified to offer, any opinion as to whether the audits complied with PCAOB standards. (Pls.' 56.1 Resp. ¶¶ 7, 224; MSHK 56.1 Resp. ¶ 101, 103.) For the reasons set forth above, the Court has excluded Hou; in any event, her testimony could not raise a triable issue as to the Auditors' compliance with PCAOB standards when she offers no admissible opinion in that regard.

Plaintiffs instead argue that MSHK's failure to obtain Shanxi's SAIC files was reckless; and that its reliance on the CVRs, the unsigned "form" legal opinion

letters, and the 2007 business licenses raise a triable issue as to recklessness. The Court has considered these arguments carefully. Again and again, however, the Court returns to the question of whether a reasonable auditor would have taken such steps under the circumstances, not whether a reasonable auditor could have. Again and again, the Court is left with the conviction that proof is necessary of what auditors conducting audit procedures under PCAOB standards would do; how many steps and which steps would be enough; and where to draw lines between what is a belt alone and when the belt is combined with suspenders. Could more have been done? Clearly yes. Did more need to be done, and would auditors conducting a PCAOB-compliant audit have done more? Neither the Court nor any reasonable juror at a trial has any way to answer this question.

In contrast, the Auditors have proffered admissible testimony from Mackintosh and Nurczynski that they conducted audits and the Appendix K reviews according to PCAOB standards. (See, e.g., Mackintosh Rep. 54.) This testimony stands unrebutted. Mackintosh and Nurczynski each have extensive experience in PCAOB compliant audits; they have each reviewed the work of the Auditors here; and they each state that the audits of MSHK (Mackintosh) and MSPC (Nurczynski) complied with those professional standards. In other words, the only testimony in the record supports an inference that neither auditor committed even negligence in the execution of its responsibilities, let alone conducted themselves in a manner that was an "egregious refusal to see the obvious," Chill, 101 F.3d at 269, or in a manner that was "highly unreasonable and

49

which represents an extreme departure from the standards of ordinary care," <u>S. Cherry Street</u>, 573 F.3d at 109.

As a result, plaintiffs have not raised a triable issue as to scienter.  Summary judgment as to the Section 10 claim against the Auditors is appropriate on that basis alone.  <u>See</u> <u>Lentell</u>, 396 F.3d at 172 (listing the elements of a Section 10 claim).

   B. <u>Subjective Falsity</u>

Section 10 and 11 claims regarding opinion statements require that the statement was both objectively false at the time that it was made and also subjectively false—that is, that defendants did not honestly believe the statements when they made them.  <u>See</u> <u>Fait</u>, 655 F.3d at 113.  Plaintiffs have failed to raise a triable issue as to subjective falsity.

Audit statements, such as the clean audit opinions presented by the Auditors in this case, are statements of opinion to which the subjective falsity requirement applies.  <u>See, e.g.</u>, <u>Fait</u>, 655 F.3d at (affirming the district court's determination that audit opinions were statements "of judgment and opinion, rather than fact," and applying the subjective falsity requirement); <u>In re Lehman Bros. Sec. & ERISA Litig.</u>, 799 F. Supp. 2d 258, 300 (S.D.N.Y. 2011) (stating that Section 11 of the Securities Act requires subjective falsity because an auditor's "opinion, just like those rendered by all or substantially all accounting firms, is explicitly labeled as just that—an opinion that the audit complied with these broadly stated standards"); <u>In re Scottish Re Group Sec. Litig.</u>, 524 F. Supp. 2d 370, 398 (S.D.N.Y. 2007) (discussing the standard for auditor statements under Section 10).

Here, there is no evidence before the Court that the Auditors knew that the Zhao brothers had transferred Shanxi Coal to themselves in 2009. (See Pls.' 56.1 Resp. ¶¶ 15–17.) Indeed, the evidence in the record and plaintiffs' arguments regarding scienter paint a narrative of dupes—an auditor and reviewer that failed to figure this fundamental fact out.

In the absence of a triable issue as to subjective falsity, both the Section 11 and 10 claims against the Auditors must be dismissed. See Fait, 655 F.3d at 113 ("Because the complaint does not plausibly allege subjective falsity, it fails to state a claim.").

### C.   Maker of the Statements

MSPC has also argued that, as a reviewer of MSHK's opinion, it did not "make" the statements for purposes of securities law liability, Janus, 131 S. Ct. at 2301. (See Def. MSPC's Mem. of L. in Supp. of Mot. for Summ. J. ("MSPC Mot.") 6–7.) The Court need not reach this issue because its rulings as set forth above result in separate and complete bases for dismissal.

## V.   PLAINTIFF'S MOTION TO STRIKE

Finally, plaintiffs have moved to strike "Defendant Moore Stephens Hong Kong's Reply in Support of its Statement of Material Facts Upon Which There is No Genuine Issue for Trial." The rules of the Court neither require nor forbid such a statement, see Local Civil Rule 56.1, and courts in the Second Circuit routinely receive such replies. Indeed, the circumstances of MSHK's motion for summary judgment—in which, moving first, MSHK was required to anticipate the arguments that plaintiffs would present in response—highlight the propriety of considering

51

this reply.  The Court is, of course, capable of individually considering each factual assertion in the parties' Rule 56.1 statements to determine whether it is factually supported or merely speculative.

In any event, plaintiffs' motion is moot.  The Court has relied throughout this opinion solely on the "[Corrected] Plaintiffs' Response to Defendant Moore Stephens Hong Kong's Statement of Material Facts" and "Defendant Moore Stephens Hong Kong's Response to Plaintiffs' Separate Statements of Additional Material Facts," and has not relied on MSHK's reply in support of its own Rule 56.1 statement.  The undisputed facts as reflected in those two Rule 56.1 statements provide sufficient basis for the Court's decisions as set forth above.

## VI.   CONCLUSION

For the reasons set forth above, the Auditors' motions for summary judgment are GRANTED; the Auditors' motions to exclude Hou and strike her declarations are GRANTED; plaintiffs' motions to exclude Mackintosh, Nurczynski, and Weimin are DENIED; and plaintiffs' motion to strike MSHK's Rule 56.1 reply is DENIED.

The Clerk of Court shall close the motions at ECF Nos. 297, 298, and 364.

SO ORDERED.

Dated:      New York, New York
            June 17, 2014

                                        _K— B. Fo_____
                                        KATHERINE B. FORREST
                                        United States District Judge